# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* STEPHAN, Minors.

UNPUBLISHED
April 19, 2018

No. 339889
Kent Circuit Court
Family Division
LC No. 15-052954-NA

Before: GLEICHER, P.J., and M. J. KELLY and CAMERON, JJ.

PER CURIAM.

The circuit court terminated respondent-mother's parental rights to her daughters, XS and CS, pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and (g) (failure to provide proper care and custody). We discern no error in the circuit court's judgment and therefore affirm.

## I. BACKGROUND

Respondent is no stranger to the child protective system. In 2000, respondent placed a one-year-old son in a guardianship with her father following a physical neglect petition. In 2001, respondent voluntarily released her parental rights to a newborn son and allowed the child's paternal grandmother to adopt him. Respondent gave birth to XS on March 5, 2008. Respondent lacked the means to provide for the baby and placed her in a guardianship with the child's maternal uncle and his wife. XS remained in relative care for nearly three years. In October 2011, respondent welcomed a second daughter, CS. On May 16, 2013, Child Protective Services (CPS) received a report that respondent was a hoarder and that her home was "filthy." CPS referred respondent for mental health services and allowed her 10 days to clean her home. On August 23, 2013, CPS received a new report that respondent had been evicted and had placed her children with her daycare provider until she could find housing. It appears no further action was taken at that time.

On August 19, 2015, respondent filed a police report against her daycare provider, Haylee Adams. Respondent asserted that XS told her aunt that Adams had digitally penetrated CS. Respondent admitted to the police that CS had come home with bruises on her face on July 27, and a belt-buckle-shaped bruise on August 13, but she had continued to leave her children with Adams. CPS visited respondent's home the next day and found it in deplorable condition. The home was swarming with flies, the kitchen was full of dirty dishes and garbage, and four-to-five-foot piles of "stuff" stood everywhere. The furniture was piled with clothing and toys, leaving no room to sit. Respondent smelled of alcohol but she refused to submit to a

-1-

Breathalyzer test. Respondent expressed that she needed to drive her children to a babysitter's house so she could go to work. CPS advised respondent that it was going to take the children immediately into care but granted respondent's request that her brother and his wife take custody.

Respondent pleaded to grounds for jurisdiction. Over the next two years, the Department of Health and Human Services (DHHS) provided services to respondent with the goal of reunification. Respondent participated in substance abuse counseling and attended support groups, but never reached a point where she could admit she was an alcoholic. Respondent had several set-backs with her sobriety throughout the proceedings. Respondent made extremely slow progress in cleaning and organizing her home. At the onset of the proceedings, respondent self-reported that she had been diagnosed with borderline personality and bipolar disorders but was not taking her prescribed medications. After a DHHS-ordered psychological evaluation, respondent was diagnosed with major depressive disorder. She thereafter participated in counseling, which included assistance with her organizational issues. Respondent also started taking her prescribed psychotropic medications.

To her credit, respondent was employed and had transportation and housing. She was financially able to provide for her children. Respondent successfully completed parenting classes and developed a safety plan to protect her children from future abuse. Parenting time also went well. Respondent visited with the children two to three times each week and called them at bedtime when her work schedule permitted. Respondent eventually graduated to unsupervised visits in the community, but not in her home. However, DHHS reinstated supervised visits because the children regressed emotionally, and because respondent was found intoxicated in her home at 9:00 a.m. on November 11, 2016.

Toward the end of the proceedings, however, respondent stopped taking her medication and her therapist noted a backslide in progress. Respondent continued to relapse into alcohol use. Respondent stopped communicating with the caseworker, preventing home visits and other necessary checks and services. The children sometimes declined to speak to their mother when she called in the evenings. Moreover, the children's uncle and aunt advised that they would prefer to adopt the girls, rather than be named guardians, so they could provide a permanent and stable home.

Ultimately, the circuit court terminated respondent's parental rights to her daughters pursuant to MCL 712A.19b(3)(c)(*i*) and (g). In doing so, the court cited respondent's continuing alcohol abuse, inability to overcome her mental health issues, and failure to adequately prepare her home for the children's return despite two years of services. The court found termination of respondent's parental rights to be in the children's best interests. The parent-child bond had been "stretched thin" as evidenced by the children's emotional distress following unsupervised parenting time sessions. Respondent had only partially complied with her service plan and made insufficient progress. The children's uncle and aunt, on the other hand, cared for the children well and desired to adopt.

Respondent now appeals.

## II. STATUTORY GROUNDS

Respondent first contends that the DHHS failed to establish statutory grounds supporting termination. Pursuant to MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" that at least one statutory ground has been proven by the DHHS. MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). We review a circuit court's factual finding that a statutory termination ground has been established for clear error. *In re Rood*, 483 Mich 73, 90-91; 763 NW2d 587 (2009). A factual finding "is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted). "Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

The circuit court terminated respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*) and (g), which provide:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

Termination is appropriate under factor (c)(*i*) when the respondent has "not accomplished any meaningful change in the conditions existing [at] the time of the adjudication." *Williams*, 286 Mich App at 272. Respondent had 22 months to rectify the conditions that led to adjudication—substance abuse, failure to protect her children from abuse, untreated mental illness, and deplorable home conditions. Respondent initially showed progress through counseling, but she never admitted her alcoholism and continued to relapse into alcohol use. Respondent began strong with counseling and taking her psychotropic medications but eventually reverted to her half-hearted approach to treatment. By May 2017, the caseworker described that respondent's home was "fairly uncluttered," but respondent still had not removed the clutter from her vehicle and had not demonstrated any length of remission from her hoarding

-3-

behaviors. Although respondent did complete parenting classes and created a safety plan to protect her children from future abuse, this standing alone did not overcome the barriers to reunification. Accordingly, the circuit court did not err in finding termination supported under factor (c)(*i*).

Termination was also supported under factor (g). "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). As noted, respondent participated in her services plan, but her dedication waned over time. Respondent showed benefit from parenting classes and initially showed progress in therapy, but ultimately never overcame her substance abuse, mental illness, and hoarding issues. Accordingly, despite 22 months of services, respondent was still unable to provide proper care and custody for her children by the time of the termination hearing and was unlikely to reach that point within a reasonable time.

### III. BEST INTERESTS

Respondent further contends that termination of her parental rights was not in the children's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *Moss*, 301 Mich App at 90. The court should weigh all the evidence available to it in determining the child's best interests. *Trejo*, 462 Mich at 356-357. Relevant factors include "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality. . . ." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, [and] the children's well-being while in care. . . ." *White*, 303 Mich App at 714. The advantages of the child's foster placement over placement with the parent are a relevant consideration, *In re Foster*, 285 Mich App 630, 634-635; 776 NW2d 415 (2009), as well as the length of time the child has been in care, *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 64; 874 NW2d 205 (2015), and whether it is likely that "the child could be returned to [the parent's] home within the foreseeable future, if at all." *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012). The court must explicitly consider a child's placement with relatives, as well as whether it is in the children's best interests to keep them together in one home. *Olive/Metts*, 297 Mich App at 42-43.

The circuit court considered the various factors affecting its best interest determination at length as it summarized the history of the case. The court noted that respondent had received services intermittently since 2000. Even so, respondent had not consistently treated her mental illness issues and therefore left herself unable to provide proper care and custody for her later-born children. The court cited respondent's continued alcohol use throughout the proceedings and its negative impact on her mental health. The court acknowledged that respondent and her children shared a bond, but emphasized testimony that the children's anxiety increased during the two months that unsupervised visits were permitted. Specifically, XS started acting out with violence at school and against her sister and CS reverted to wetting the bed.

-4-

Contrary to respondent's objection on appeal, the court did consider that the children were placed with relatives before terminating her parental rights. During the case history, the court described that the DHHS had at one point considered changing the goal from reunification/termination track to arranging a guardianship. However, XS had been placed in a guardianship with respondent's brother and his wife for nearly the first three years of her life. Respondent eventually regained custody of XS but could not maintain custody of her children in the long term due to mental illness and alcohol abuse. The court, the DHHS, and the children's caregivers all feared that a renewed guardianship would "lead[] to the same sort of outcome." The court later noted that the children "don't need perfection," but "[t]hey need parents who are stable and are able to care for them." Ultimately, the court reiterated the children's need for permanence and stability and determined that respondent's inability to provide this type of environment weighed in favor of termination. Given the record evidence, we discern no error in the court's analysis or its final determination that termination of respondent's parental rights was in the best interests of XS and CS.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly
/s/ Thomas C. Cameron